**McDONALD**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 201, Docket 22597.

United States Court of Appeals Second Circuit.

Argued April 14, 1954.

Decided July 7, 1954.

Philip M. Aitken, Lincoln, Neb., for petitioner.

L. W. Post, Sp. Asst. to Atty. Gen., Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Sp. Asst. to Atty. Gen., Washington, D. C., on the brief), for respondent.

Before CLARK and HINCKS, Circuit Judges.

CLARK, Circuit Judge.

This petition for review of a decision of the Tax Court of the United States involves the tax treatment under I.R.C. § 117(j) of the proceeds from sale of cattle from a dairy and breeding herd. From the facts found the following appears.

The taxpayer, James M. McDonald, during 1946 was the owner of a dairy and breeding herd of pure bred Guernsey cattle. It was one of the best herds of Guernsey cattle in the country, a status achieved after some 13 years of careful selective breeding. It was the taxpayer's practice, after carefully controlling the mating of his animals, to cull as rapidly as possible those calves which did not measure up to the high standards of his herd. Some calves were rejected at

birth, but the great majority were screened out during the periodic inspections which commenced at the seventh month. When unsatisfactory characteristics developed, sometimes only in the animal's offspring or grandchildren, the animal was sold. Nature being what it is, many more bulls than heifers were thus disposed of. Taxpayer had never retained a fixed percentage of calves, but had kept as many each year as proved suitable. In addition to the animals thus raised he had purchased animals from other herds in further efforts to improve his strain. The size of his herd had grown in every year but two, since its inception in 1933.

In 1946 the taxpayer sold 201 animals of varying ages, some of which had been raised, and others acquired by purchase. The proceeds from those which he had held less than six months he reported as ordinary income; the rest he reported as capital gain. The Commissioner determined that all of these receipts were taxable as ordinary income, and filed a notice of deficiency. On review the Tax Court held, 17 T.C. 210, that those animals acquired by purchase and those raised animals which were 24 or more months of age were "property used in the trade or business" within I.R.C. § 117(j) (1) as it then stood, and hence were entitled to capital treatment. The other animals were held to have been sold in the ordinary course of business and the proceeds treated as ordinary income. Thereafter Congress enacted § 324 of the Revenue Act of 1951, 26 U.S.C.A. Int.Rev. Acts, page 323, which retroactively amended § 117(j)(1) to include within "property used in the trade or business" "*livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes*" for more than six months. (Italics supplied.) Taxpayer moved in the Tax Court to vacate or re-

vise its order; but after a hearing the motion was denied, largely on the authority of Walter S. Fox, 16 T.C. 854, affirmed Fox v. C. I. R., 4 Cir., 198 F.2d 719. Thereafter the taxpayer petitioned for review here.

■ The question of purpose for which an animal is held is essentially one of fact. United States v. O'Neill, 9 Cir., 211 F.2d 701; Fox v. C. I. R., supra. We have no doubt that in many cases it is readily resolved; but upon the facts here, the answer is not so simply deducible. As the Tax Court found, the taxpayer initially retained all of the cattle here involved with the hope that they would measure up to his high standards. On the other hand, it was always clear and predictable that each year substantial numbers of them would eventually be culled and sold. It was this predictability which led the Tax Court to the view that the young animals were held for sale up to the point where their breeding qualities had been tested by examination of their offspring. This period of time it fixed at 24 months; and so it held the proceeds of cattle sold earlier to be only income.

The case of Fox v. C. I. R., supra, dealt with a similar situation. The taxpayers in that case raised Aberdeen Angus cattle for use in their breeding herd and for sale as breeders. It appears that the age at which they sold their young animals depended on the varying preferences and desires of purchasers. This differs sharply from the practice herein, which was to cull animals for sale as rapidly as they evidenced undesirable characteristics.[1] So these facts of the Fox case would afford some basis for a conclusion that there the animals were held for sale.

In justice to the Tax Court, however, which relied on this case in denying the motion to vacate or revise its decision, we must grant that this circumstance

1. Counsel for the taxpayer raises another possible distinction in his claim that the appreciation in value of beef calves more than covers the cost of their maintenance, whereas the reverse is true with dairy calves. If this is so it is strongly persuasive that the motive for holding these dairy calves was not sale, but inclusion in the breeding herd. The Tax Court, however, made no finding on this point; and since the record is inconclusive, we disregard it.

was given little weight in the opinion of the Fourth Circuit Court of Appeals. The opinion emphasized the regularity and high proportion of sales and the failure to test breeding qualities before disposing of the animals. And it pointed very strongly to the results reached by the Tax Court herein.

We think, however, that this view penalizes breeders with skill sufficient to detect and cull inferior animals even before they have been bred. True, an affirmative judgment that an animal is superlative cannot be made without examination of its offspring. But the evidence is compelling that a negative judgment can often be made on the basis of such factors as brightness of eyes, width of nostrils, size of muzzle, length of neck, sharpness of shoulders, depth of chest and spring of ribs, straightness of back, width and level of rump, and, in the case of a cow, size of udder and its firm attachment to the body. Thus younger animals can be accurately culled, and the animals which the taxpayer sold were selected in this manner. Before an animal had been thus weeded out it was part of the regular herd, held for dairy and breeding purposes until it should prove unfit. See O'Neill v. United States, D.C.S.D.Cal., 5 CCH 1952 Fed. Tax Rep. ¶9462, affirmed United States v. O'Neill, 9 Cir., 211 F.2d 701; Pfister v. United States, D.C.S.D., 102 F.Supp. 640, reversed on other grounds United States v. Pfister, 8 Cir., 205 F.2d 538.

Of course it was in the taxpayer's contemplation that many or most of the animals would be found wanting and be sold. The operation might perhaps even have proved unfeasible without the income thus derived. And in a very real sense the taxpayer could have said at any moment that most of his calves were held for possible sale. But this was not the motive behind their retention, and legislative history of the new law shows that motive is to be controlling. And it is this new law which is and must be decisive.

Prior to this 1951 amendment the Commissioner had first refused to recognize that livestock could qualify for treatment under the capital gains provision, and then had ruled that only unusual reductions of herd would suffice. A series of adverse rulings in the courts, Albright v. United States, 8 Cir., 173 F.2d 339; United States v. Bennett, 5 Cir., 186 F.2d 407; Miller v. United States, D.C.Neb., 98 F.Supp. 948, led him to modify his position so as to allow such treatment of animals sold after being employed for substantially their full period of usefulness. Treas. Dept. Bull. June 17, 1951, Mim. 6660, 1951–2 Cum. Bull. 60. But all of the foregoing cases had given the section a far more liberal interpretation than this, granting favored treatment to the proceeds from young animals, and in two of the cases [2] from heifers (females which had never dropped a calf).

When Congress undertook to amend § 117(j)(1), it was made fully cognizant of this situation by representatives of livestock and breeding associations. Hearings before Committee on Finance on H.R. 4473, Revenue Act of 1951, Part 3, pp. 1538, 1837, 2396; Sen.Rep. No. 781, 82d Cong., 1st Sess. 41–42. And it is manifest that the section was drafted with an eye to the breeders' complaints. Thus in defining property "used" in the business the amendment speaks of livestock "held" for an appropriate purpose, and adds the further proviso that it apply "regardless of age." The intent to repudiate the Commissioner's view is obvious, even without the specific statements in the Report of the Senate Committee on Finance, supra. And it is equally clear that the animal need not be mature and need not have been put to its intended use.

■ Hence we cannot accept the Tax Court's ruling that the animals must be

---

2. Albright v. United States, supra, 8 Cir., 173 F.2d 339, and Miller v. United States, supra, D.C.Neb., 98 F.Supp. 948. The court in the Miller case indicated its belief on apparently some special information that United States v. Bennett, supra, 5 Cir., 186 F.2d 407, also involved the sale of heifers. 98 F.Supp. at page 956.

24 months old, the age at which they have presumptively had offspring. Equally we disapprove the view that an animal is held for breeding purposes only if there is an expectation and intention that it produce offspring. Life is replete with situations (advertising, war, reproduction) where many are employed in the hope that one will succeed. Yet the purpose subserved by the many is clear. This does not mean that every farmer can obtain the benefit of the capital gains provision for his entire calf crop merely by selecting one of the better looking animals every time he needs a replacement for his producing herd. This taxpayer, however, has made a thoroughly convincing record that his retention of calves was a necessary factor in building his champion herd. He is entitled to the benefit of I. R. C. § 117(j)(1) in its new and revised form.

There remains the Commissioner's alternative position in the Tax Court that if the proceeds of these sales are treated as capital gains, then the taxpayer's statutory gross income would be reduced, thereby increasing his operating loss deduction which has been continuous from the beginning of his operations. See United States v. Benedict, 338 U.S. 692, 70 S.Ct. 472, 94 L.Ed. 478. This recomputation, the Commissioner asserts, would bring the taxpayer within the provisions of I.R.C. § 130, which limits deductions on operating losses continuing over a five-year period. Section 130, first appearing in the 1943 Revenue Act, 26 U.S.C.A.Int.Rev.Acts, page 456, was aimed to prevent the deduction of excessive "hobby losses" and requires a recomputation of net income and limitation of deduction where losses for five consecutive years have exceeded gross income from the business by $50,000 for each of such years. The Tax Court did not reach this point. Since the Commissioner did not petition for review, he can use the claim only defensively to sustain such part of the decision as is already in his favor. Rosenthal v. C. I. R., 2 Cir., 205 F.2d 505; Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224.

But he is clearly entitled to use it to that extent; and since the point was not developed in the Tax Court, it should be made there with adequate findings on the remand. The decision must therefore be reversed and the proceedings remanded to the Tax Court for further action in accordance with this opinion.

Reversed and remanded.